Kent A. Kawakami, CA Bar #149803
U.S. Attorney's Office
300 N. Los Angeles St., #7516
Los Angeles, CA 90012
Tel. 213-894-4858
Fax 213- 894-2380

James H. Holl, III, CA Bar #177885
*jholl@cftc.gov*
Alison B. Wilson, DC Bar #475992
*awilson@cftc.gov*
Attorneys for Plaintiff
U.S. Commodity Futures
Trading Commission
1155 21st Street, NW
Washington, DC 20581
Tel. 202-418-5000
Fax 202-418-5538

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION | ) ) ) Case No. 8:14-cv-00283-AG-JPR |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| MY FOREX PLANET, INC., a Nevada Corporation, WAL CAPITAL, S.A., a Costa Rica Corporation, TOP GLOBAL CAPITAL, INC., a Panama Corporation, MELODY NGANTHUY PHAN, an individual, Defendants. | ) **ORDER** ) ) ) ) ) ) ) ) |

## I.    INTRODUCTION

On February 27, 2014, the  Plaintiff U.S. Commodity Futures Trading

Commission ("Plaintiff") filed its Complaint [D.E. #1] in this matter against My

Forex Planet, Inc., Wal Capital, S.A., Top Global Capital, Inc. (collectively, the "Corporate Defendants"), and Melody Nganthuy Phan (together the "Defendants" or "Phan Common Enterprise"), alleging, *inter alia* that the Defendants defrauded members of the public ("pool participants") of more than $1.1 million in connection with pooled investments in foreign currency exchange ("forex"), in violation of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§1 *et seq.*, and CFTC Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq.* D.E. # 1.  More particularly, the Plaintiff alleged that from at least January 2009 and through at least February 2011 ("the Relevant Period"), the Corporate Defendants, acting through their agents and the Defendant Phan, fraudulently solicited at least $3,764,214 from at least 174 customers for trading off-exchange leveraged or margined forex and failed to register as a Commodity Pool Operator ("CPO").

On June 26, 2014, the Plaintiff served the Summons, Complaint, and other initiating documents on the Defendants, serving Melody Phan in her personal capacity, as well as in her capacity as an Officer and Director of My Forex Planet, Inc. and a control person of Wal Capital, S.A. and Top Global Capital, Inc.  The Complaint seeks, among other things, injunctive relief, restitution, and civil monetary penalties.

The Plaintiff filed its Proofs of Service with the Clerk's Office on July 9, 2014.  D.E.  ## 21-24.  The Defendants did not answer the Complaint or otherwise make an appearance in this case.  On August 21, 2014, the Clerk of the Court

entered the Default of the Defendants.  D.E.  #28.  On January 5, 2015 pursuant to Fed. R. Civ. P. 55(b)(2) and California Code of Civil Procedure 585(b), the Plaintiff filed a Notice of Plaintiff's Motion for Entry of Default Judgment Against the  Defendants ("Motion") [D.E. # 31] and a Memorandum of Law in support of the Motion ("Memorandum of Law") [D.E. # 32].

The Court has considered carefully the Motion, the Memorandum of Law, including the Declaration of Futures Investigator Maura Viehmeyer, and the lodged exhibits, and the well-pleaded allegations in the Complaint, which are hereby taken as true, and being fully advised in the premises, the Court hereby:

**GRANTS** the Plaintiff's Motion and enters the following findings of fact and conclusions of law finding the Defendants liable as to all violations alleged in the Complaint.  Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Equitable Relief Against the Defendants ("Order"), which determines that the Defendants have violated 7 U.S.C. §§ 6b(a)(2)(A) and (C), 6(o)(1), 6(m)(1) (2012), and 17 C.F.R. § 5.2(b)(1) and (3) (2014).

## II.    FINDINGS OF FACT

### A.    <u>The Parties</u>

#### *The Plaintiff*

1.    The **U.S. Commodity Futures Trading Commission** ("CFTC") is an independent federal regulatory agency that is charged by Congress with the

administration and enforcement of the CEA and the Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

### *The Defendants*

2.      **My Forex Planet, Inc.** ("MFP") is a Nevada corporation, which was incorporated by Melody Phan in 2006.  Melody Phan and her husband jointly owned MFP, however, she controlled MFP: 1) Melody Phan was the sole Director and President of MFP; 2) Melody Phan controlled MFP's bank and trading accounts; and 3) Melody Phan made all of the hiring and firing decisions at MFP.   MFP was used to recruit customers for Melody Phan's fraudulent investment schemes through trading classes run by Melody Phan and other agents.  MFP had pending registrations with the CFTC as an introducing broker ("IB"), commodity trading advisor ("CTA"), but withdrew these applications before the CFTC decided their merit.

3.      **Wal Capital, S.A.** ("Wal Capital"), upon information and belief, is a company owned or controlled by Melody Phan and incorporated in Costa Rica.  Wal Capital operated as a forex broker, offered customers self-traded forex accounts, and carried customer accounts managed by Melody Phan or the other Corporate Defendants. Wal Capital has never been registered with the CFTC in any capacity.

4.      **Top Global Capital, Inc.** ("TGC"), upon information and belief, is a company owned or controlled by Melody Phan and was incorporated in Panama.

TGC was used by Melody Phan, among other things, to operate a fraudulent forex commodity pool.  TGC has never been registered with the CFTC in any capacity.

5.     **Melody Nganthuy Phan** ("Phan") was last known to reside in Las Vegas, Nevada, but during the Relevant Period resided in Orange County, California. Phan operated her various businesses from Orange County, California.  Phan owns or controls the Corporate Defendants and used them to perpetrate her fraudulent schemes in connection with leveraged or margined forex as a common enterprise. Phan has never been registered with the CFTC in any capacity; however she submitted a registration application as an Associated Person and principal of MFP, but later withdrew this registration application before the CFTC decided its merit.

**B.     Background: The Defendants Began Their Fraudulent Scheme**

6.     In 2006, Phan incorporated MFP, and shortly after, began teaching forex trading classes using the MFP entity.  MFP operated out of storefront in Garden Grove, California from which Phan also ran a number of unrelated businesses.  MFP, through Phan and other agents, touted Phan as an extremely successful forex trader with a proven trading system.  Once students enrolled in the forex trading classes, Phan and her agents, began soliciting the students to participate in a number of other forex-related businesses.

7.     Initially, Phan and her agents referred MFP customers who wished to begin trading forex to forex brokers with whom MFP had an established relationship so that MFP could collect referral fees.  After Phan incorporated Wal Capital in 2008,

she began operating it as a forex broker, offering self-traded retail forex accounts to customers most of whom were based in the United States and recruited through MFP trading classes.

8.     In addition to MFP and Wal Capital, Phan, while acting as an unregistered commodity pool operator ("CPO"), also operated a forex commodity pool through TGC, which was incorporated in 2009.  Phan and other agents then began soliciting existing MFP and Wal Capital customers to become pool participants at TGC.

9.     By late 2009, Phan was operating the Corporate Defendants as a common enterprise (collectively "Phan Common Enterprise") out of a variety of locations in California.  The Phan Common Enterprise operated out of the same physical locations, commingled funds, shared agents, and was under the common control of Phan.  Phan, on behalf of herself and the Phan Common Enterprise, used additional small entities which were subject to her control to accept and disburse monies for the Phan Common Enterprise, including, but not limited to: Forex Franchising, Zenoost, Soleil and West Newport.

## C.    The Defendants' Fraudulent Solicitations of Wal Capital Customers and TGC Pool Participants

10.    Throughout the relevant period, Phan and the Phan Common Enterprise schemed to defraud individuals who became customers of her various forex-related ventures.  Each act or omission by Phan and the Phan Common Enterprise in

furtherance of the fraudulent scheme was done with the knowledge or consent of the others, and was done knowingly or with reckless disregard for the truth.

11.    Phan, herself and through the Phan Common Enterprise, fraudulently solicited customers using MFP for at least two types of fraudulent investment schemes: 1) self-traded forex accounts opened at Wal Capital; and 2) pooled forex trading at TGC.  Most, if not all, of these customers were U.S. residents. During the relevant period, Phan, herself and through the Phan Common Enterprise, fraudulently solicited at least $1,677,762.29 from at least 112 customers who believed they opened self-traded forex accounts at Wal Capital.  During the relevant period, Phan, herself and through the Phan Common Enterprise, fraudulently solicited and received at least $2,086,451.88 from at least 62 customers who became pool participants in a pooled forex trading account at TGC.

12.    At least some of these customers at Wal Capital and pool participants at TCG were not eligible contract participants ("ECP").   An ECP, as relevant here, is an individual who has total assets in an amount in excess of (i) $10 million or (ii) $5 million and who enters into the transaction in order to manage risk.  *See* 7 U.S. C. §1a(18)(A)(xi) (2012) (post July 16, 2011) and 7 U.S.C. § 1a(12)(A)(xi) (2006) (pre July 16, 2011).

13.    MFP, through Phan, the Phan Common Enterprise, and other agents, recruited students for its forex classes by word-of-mouth, as well as through ads posted on Craigslist, You Tube, and on Vietnamese-language radio stations.  The

MFP forex trading classes were often multi-day sessions, given in English or Vietnamese.  Tuition ranged from approximately $500 to $2000.  MFP, through Phan and others, would periodically waive the cost of the trading classes if students agreed to trade a minimum volume in forex.  MFP classes provided an overview of forex trading as well as training in forex trading strategies.  MFP, through Phan and others agents, also taught a trading strategy purportedly developed by Phan.

14.     Once individuals began taking trading classes at MFP, Phan and the Phan Common Enterprise, solicited customers to open self-traded forex accounts at Wal Capital and invest in the TGC forex pool by making the following fraudulent statements: 1) Phan was a highly successful forex trader who had made millions of dollars trading forex; 2) Phan's forex trading system, which was taught during MFP classes, was a very safe system that virtually guaranteed profit over time; and, 3) money deposited by Wal Capital customers and TGC pool participants would be used for trading.  Additionally, TGC pool participants were promised that: 4)  profits would be generated by trading by Phan or traders Phan trained; and, 5) they would get monthly returns of 3-5%, and at least two pool participants were told their returns would be as high as 15% a month.

15.     In fact, Phan was not a successful forex trader.  Between approximately October 2006 and December 2011, Phan controlled at least 29 trading accounts in her name, her husband's name, or in the name of various companies.  Of Phan's 29 trading accounts, 17 accounts showed an aggregate net loss of approximately $1.41

million.  Despite Phan's claims of success, only one of these 17 accounts appears to have been profitable, with total net profits of less than $1,000.

16.     Upon information and belief, the remaining 12 trading accounts were not as profitable as Phan and the Phan Common Enterprise had represented.  Of these 12 accounts, 9 had more funding sent to the trading accounts than returned from the trading accounts, strongly suggesting that those 9 accounts suffered overall net trading losses.  The outstanding 3 trading accounts appear to have been net winners. However, the potential profits in these 3 trading accounts ranged from approximately $3,000 to approximately $50,000, far less than the highly successful trading represented by Phan, herself and through the Phan Common Enterprise.

17.     The representations made about the success and levels of risk associated with Phan's trading system by Phan, herself and through the Phan Common Enterprise, were also false.  Phan's trading system was risky and unlikely to result in profits.  Phan, and other agents acting pursuant to her instruction, taught MFP customers to trade without stop - loss orders, thereby exposing the customers to unlimited losses in their trading.  This method of trading resulted in significant losses as described above.  Phan's trading system was neither safe nor likely to generate profits as promised.

18.     As detailed below, despite their solicitations to the contrary, Phan and the Phan Common Enterprise, by Phan's own admission, did not always transfer the funds deposited by customers for the purpose of trading into Wal Capital's trading

accounts or the TGC pool accounts.  In fact, Wal Capital never maintained

segregated bank or trading accounts for customer funds.

19.     Despite assurances by Phan and the Phan Common Enterprise, TGC

funds were not always traded by Phan and/or traders trained by Phan.  In sworn

testimony, Phan admitted that she did not trade the TGC forex pool for several

months despite leading pool participants to believe that their accounts were trading

and earning money.

20.     Finally, TGC pool participants were told that they would get monthly

returns of 3-5% from forex trading, and at least two pool participants were told their

returns would be as high as 15% a month through forex trading.  However, Phan did

not trade the TGC pool for a number of months, and pool participants accounts did

not appreciate.

**D.**     **The Defendants' Misappropriation of Funds from Wal Capital**
       **Customers and TGC Pool Participants**

21.     Phan, herself and through the Phan Common Enterprise,

misappropriated customer funds by: 1) failing to use funds for the purposes intended

by the customers (e.g., using funds for business expenses, using funds to pay back

other customers, and failing to trade forex); and 2) failing to honor withdrawal

requests.

22.     Rather than open individual accounts at a futures commission merchant

("FCM"), Wal Capital customers opened what they believed to be were self-traded

forex accounts at Wal Capital.  Customers deposited funds by check, wire transfer,

credit card, or cash to either a Wal Capital bank account or, at times, to other accounts controlled by Phan.  In this way, Phan had access to Wal Capital customer funds.  Once Wal Capital customers deposited funds into their individual trading accounts, they were then able to log into their respective accounts in order to view their balances.  In order for Wal Capital customers to execute futures transactions, they made trades through a Wal Capital trading platform.  In theory, Wal Capital would then execute the transaction for a customer at an FCM in an account in the name of Wal Capital and, presumably, funnel futures profits and losses back into a customer account at Wal Capital.

23.     However, despite the fact that Wal Capital customers' accounts showed balances reflecting their deposits and various trades, in reality, Phan, herself and the Phan Common Enterprise, did not always deposit Wal Capital customer funds into their proper accounts.  Phan and Phan Common Enterprise frequently diverted customer deposits from Wal Capital trading accounts to be used to satisfy other customer requests for pay outs.  Phan and the Phan Common Enterprise also used funds intended for Wal Capital customer accounts for the business expenses for the Phan Common Enterprise, such as radio advertising and software development.

24.     Similarly, TGC pool participants deposited funds primarily by checks or wire transfers into a Wal Capital bank account over which Phan had control.  As with the Wal Capital scheme, TGC pool participants could log into a TGC website on which they could view their balances.  And, as with the Wal Capital scheme, TGC

customer deposits did not always make it to their intended location.  Rather, customer deposits were used to pay back other customers and for the business expenses of the Phan Common Enterprise.  Moreover, Phan did not trade or instruct her agents to trade the TGC pool funds between at least December 2009 and August 2010, and failed to inform TGC pool participants that their funds were not being traded.  Despite this, TGC, through Phan, continued to post monthly trading profits of 3-5% in the customer accounts during this time period and altered the balances posted on the TGC website to reflect this fictional profit as well.  Moreover, as discussed above, TGC, through Phan, also altered the balances posted on the TGC website to reflect the intended customer deposits of funds, despite the fact that some if not all of the customer funds had been diverted.

25.     Phan, acting on behalf of and through the Phan Common Enterprise, employed a myriad of accounting devices in order to perpetrate the fraudulent schemes, including: using  personal and corporate bank accounts not associated with the Phan Common Enterprise; cash transactions; incorporation of numerous US and international legal entities through which to funnel cash; US and international trading accounts; and using the assistance of other individuals to make such transactions so they could not be directly traced to the Phan Common Enterprise and Phan.

26.     When Wal Capital customers and TGC pool participants made withdrawal requests, Phan, herself and through the Phan Common Enterprise, paid customers through various bank accounts.  These bank accounts included the Wal

Capital corporate bank account and bank accounts registered to other companies owned or controlled by Phan.  On occasion, Phan paid customers with cash, either directly or funneled through the personal bank accounts of Phan's associates.  As discussed above, often customer pay outs did not originate from the withdrawing customer's account, but instead from incoming customer deposits.

27.     In many instances, however, customer withdrawal requests were not honored.  During the course of her operation of Wal Capital and TGC, Phan, herself and through the Phan Common Enterprise, gave customers who asked to withdraw funds various excuses and false assurances when the withdrawal requests were not met.  For example, Phan told customers and pool participants that: 1) withdrawals were delayed because there were "stuck positions" in the account and the funds could not be withdrawn before those positions were closed; 2) withdrawals were delayed because the funds were overseas and foreign authorities restricted fund transfers; and 3) withdrawals were delayed to avoid scrutiny by U.S. authorities.  Additionally, Phan, herself and through Phan Common Enterprise, falsely promised customers that their withdrawals would be met by various dates, but in fact, Phan and the Phan Common Enterprise failed to honor the withdrawal requests as promised.  In many instances, Wal Capital did not have the funds to repay the customers because the Defendants had misappropriated them to pay for Phan Common Enterprise business expenses and prior customer withdrawals.  Phan's assurances that the funds would be returned and the excuses for the delays were therefore false and misleading.

13

### III.   CONCLUSIONS OF LAW

**A.**     **Jurisdiction and Venue**

28.     The Court has jurisdiction over the conduct and transactions at issue in this case pursuant to 7 U.S.C. § 13a-1 (2012), and 7 U.S.C. § 2(c)(2) (2012).  7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

29.     Venue properly lies with the Court pursuant to 7 U.S.C. § 13a-1(e), in that the Defendants were found in, inhabited, and/or transacted business in the Central District of California, and the acts and practices in violation of the Act occurred within this District, among other places.

**B.**     **The Defendants Committed Fraud in Connection with Futures in Violation of 7 U.S.C. §§ 6b(a)(1)(A) and(C) and 17 C.F.R. § 5.2(b)(1) and (3)**

30.     Under the CEA, it is unlawful for any person to (A) cheat or defraud or attempt to cheat or defraud another person, or (C) willfully to deceive or attempt to deceive such other person by any means whatsoever, in connection with any futures transaction.  *See* 7 U.S.C. §§ 6b(a)(2)(A) and (C).  Pursuant to 7 U.S.C. § 2(c)(2)(C)(iv) (2012), 7 U.S.C. § 6b applies to the Defendants' forex transactions "as if" they were contracts of sale of a commodity for future delivery.  Similarly, 17 C.F.R. § 5.2(b)(1) and (3)

prohibits fraudulent activity "in or in connection with any retail forex transaction."

31.     During the relevant period, the Defendants violated 7 U.S.C. §§ 6b(a)(1)(A) and (C) as well as 17 C.F.R. § 5.2(b)(1) and (3), with respect to acts that were knowing, or had reckless disregard for the truth such as:

(a)     Soliciting prospective participants to invest in forex through fraudulent misrepresentations that the Defendant Phan was a highly successful forex trader;

(b)     Representing that the Defendants' trading system was safe and virtually guaranteed profit;

(c)     Falsely claiming that customer monies would be used for trading forex;

(d)     Representing to pool participants that profits would be generated by the Defendant Phan's trading or associated traders; and

(e)     Promising pool participants that they would get monthly returns of 3-5%.

C.     **The Defendant Phan Committed Fraud by a Commodity Pool Operator in Violation of 7 U.S.C. § 6o(1)**

32.     7 U.S.C. §§ 6o(1)(A) and (B) (2012) make it unlawful for a commodity pool operator ("CPO") or an associated person of a CPO from using the mails or any means of interstate commerce to (i) employ any device, scheme or artifice to defraud any pool participant or prospective pool participant, or (ii)

engage in any transaction, practice or course of business that operates as a fraud or deceit upon any pool participant or prospective pool participant.

A CPO is defined as any person who is:

> (i)   Engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any---
> (I)   Commodity for futures delivery . . .

7  U.S.C. § 1a(11) (2012).

33.   During the relevant period, Phan acted as a CPO in that she engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and in connection therewith solicited, accepted, or received funds, securities, or property from others for the purpose of trading in commodities for future delivery on or subject to the rules of any contract market.  Moreover, Phan was also not registered as a CPO with the CFTC during the relevant period.

34.   During the relevant period, Phan, individually, and as the agent of the Corporate Defendants, violated 7 U.S.C. §§ 6o(1), by defrauding and deceiving participants by, among other things:

(a)   misappropriating pool participants' funds;

(b)   misrepresenting that pool participants' funds would be used for their intended purposes;

(c)     guaranteeing profits to pool participants, and

(d)     misrepresenting the experience and success of the Defendant Phan and her trading system.

35.     The above misrepresentations and omissions of fact that Phan, made to prospective and actual participants were made through use of the mails or other means or instrumentalities of interstate commerce, and they were made by Phan, a CPO, in violation of 7 U.S.C. §§6o(1).

**D.      The Defendant Phan Failed to Register as a CPO in Violation of 7 U.S.C. § 6m(1)**

36.     U.S.C. § 6m(1), prohibits a CPO, unless registered, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.  During the relevant period, Phan used the mails or instrumentalities of interstate commerce, including fraudulent communications sent *via* email, to commodity pool customers while failing to register as a CPO. Therefore Phan violated 7 U.S.C. § 6m(1).

**E.      The Corporate Defendants' Liability Under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2**

37.     Phan committed the acts and omissions described herein within the course and scope of her employment as an officer or agent at or with the Phan Common Enterprise.   7 U.S.C. § 2(a)(1)(B) (2012) states that:

The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust

17

> within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

*Id.*

Similarly, 17 C.F.R, § 1.2 (2014) provides that:

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust, within the scope of his employment or office, shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust as well as of such official, agent, or other person.

*Id.*

38.     Because Phan committed her fraudulent solicitations, misappropriations, and registration violations as an officer or agent of the Corporate Defendants, the Corporate Defendants are liable as principals for their agent's (Phan's) violations of the CEA and Regulations.

F.     **The Defendant Phan's Liability Under 17 U.S.C. § 13c(b)**

39.     During the Relevant Period, Phan, directly or indirectly, controlled the Corporate Defendants and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the Phan Common Enterprise violations of 7 U.S.C. §§ 6b(a)(2)(A) and (C) , 7 C.F.R. §§ 5.2 (b)(1) and (3). 7 U.S.C. § 13c(b) (2012) provides that:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith

18

or knowingly induced, directly or indirectly, the act or acts constituting the violation.

*Id*.

40.     Under the facts as alleged in the CFTC's Complaint, Phan directly controlled the Corporate Defendants during their commission of forex fraud, therefore Phan is liable for the Corporate Defendants' violations pursuant 17 U.S.C. § 13c(b) .

## IV.     PERMANENT INJUNCTIVE RELIEF GRANTED

41.     Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, the Defendants are permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of 7 U.S.C. §§ 6b(a)(2)(A) and (C), and, as of October 18, 2010, 17 C.F.R. §§ 5.2(b)(1) and (3).  Additionally, the Defendant Phan is permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation 7 U.S.C. §§ 6o(1) and 6m(1).

42.     The Defendants are also permanently restrained, enjoined and prohibited from:

a.     entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in 17 C.F.R. § 1.3(hh)), security futures products, swaps (as that term is defined in 7 U.S.C. § 1a(47), and as further defined by 17 C.F.R. § 1.3(xxx)), and/or foreign

currency (as described in 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account(s) or for any account(s) in which they have a direct or indirect interest;

       b.    having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

       c.    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

       d.    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

       e.    applying for registration or claim exemption from registration with the Commission in any capacity, and engage in any activity requiring such registration or exemption from registration with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9); and/or

       f.    acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person (as that term is

defined in 7 U.S.C. § 1a) registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V. RESTITUTION AND CIVIL MONETARY PENALTY

### A. Restitution

43.     The Defendants shall be jointly and severally liable for, and shall pay, restitution in the amount of one million, one hundred fifty-one thousand, nine hundred fifty-four dollars and twenty cents ($1,151,954.20) ("Restitution Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

44.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to the Defendants' pool participants, the Court appoints the National Futures Association ("NFA") as Monitor.  The Monitor shall collect restitution payments from the Defendants and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

45.     The Defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "Direct Investment Products Restitution Fund" and shall send such Restitution Obligation payments by electronic funds

transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under a cover letter that identifies the Defendant making payment and the name and docket number of this proceeding. The Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

46.      Any financial institution holding funds of the Defendants is directed to liquidate and release all such funds, whether the funds are held in a single or joint account, or in any other capacity, and to convey them (minus any amounts to cover the financial institution's administrative or wire transfer fees) by wire transfer to an account designated by the Monitor within thirty (30) days of receiving a copy the this Order.  At no time during the liquidation, release, and /or wire transfer of these funds pursuant to this Order shall the Defendants be afforded any access to, or be provided with, any of these funds.  The Defendants, and all financial institutions subject to this Order, shall cooperate fully with the Commission and the Monitor in the liquidation, release, and wire transfer of these funds.

47.      The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable

fashion to the Defendants' pool participants identified by the Monitor and/or the Commission or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth below.

48.    The Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify the Defendants' pool participants to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. The Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

49.    Any amounts paid to any pool participant shall not limit the ability of that pool participant from proving that a greater amount is owed from the Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state

or common law.  Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each pool participant of the Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by the Defendants to ensure continued compliance with any provision of this Order and to hold the Defendants in contempt for any violations of any provision of this Order.

50.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of the Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.     Civil Monetary Penalty**

51.     The Defendants shall be jointly and severally liable for, and shall pay, a civil monetary penalty of three million, four hundred fifty-five thousand, eight hundred sixty-two dollars and sixty cents ($3,455,862.60) within ten (10) days of the date of entry of this Order ("CMP Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

52.     The Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank

money order. If payment is to be made other than by electronic funds transfer, then

the payment shall be made payable to the Commodity Futures Trading

Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables - AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FANMMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment by electronic funds transfer is chosen, the Defendants shall contact

Nikki Gibson or her successor at the address above to receive payment instructions

and shall fully comply with those instructions.  The Defendants shall accompany

payment of the CMP Obligation with a cover letter that identifies the paying the

Defendant and the name and docket number of this proceeding.  The Defendants

shall simultaneously transmit copies of the cover letter and the form of payment to

the Chief Financial Officer, Commodity Futures Trading Commission, Three

Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

53.    Any acceptance by the Commission or the Monitor of partial payment

of the Defendants' Restitution or CMP Obligations shall not be deemed a waiver of

the Defendants' obligation to make further payments pursuant to this Consent

Order, or a waiver of the Commission's right to seek to compel payment of any

remaining balance.

54.     The Defendants shall not transfer, or cause others to transfer, funds or other property belonging to the Defendants to the custody, possession, or control of any members of their family or any other person or entity for the purpose of concealing such funds from this Court, the Commission, or the Monitor or any officer appointed by this Court.

## VI.   MISCELLANEOUS PROVISIONS

55.     All notices required by this Order shall be sent by certified mail, return receipt requested. Notices to the Commission shall be sent to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.  The Defendants shall provide the Commission and the Receiver with written notice of their contact telephone numbers and/or mailing addresses within thirty (30) calendar days of this Order.  Until such time as the Defendants satisfy their Restitution and CMP Obligations as set forth in this Order, the Defendants shall provide written notice by certified mail to the Commission and the Receiver and/or Monitor of any change to their telephone number and/or mailing address within ten (10) calendar days of the change(s).

56.     Nothing shall serve to amend or modify this Order in any respect whatsoever, unless: (a) reduced to writing; and (b) approved by order of this Court.

57.　　If any provision of this Order or if the application of any provision or circumstance is held invalid, the remainder of the Order and the application of its provisions to any other person or circumstance shall not be affected by the holding.

58.　　The injunctive and equitable relief provisions of this Order shall be binding upon the Defendants, upon any person under their authority or control, and upon any person who receives actual notice of this Order by personal service, e-mail, facsimile, or otherwise, insofar as he or she is acting in active concert or participation with the Defendants.

59.　　This Court shall retain jurisdiction of this cause to assure compliance with this Order, the Restitution Obligation, the CMP Obligation, and for all other purposes related to this action.  This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Central District of California, and all provisions of the Act and Commission Regulations relating or referring to the obligations hereunder.

60.　　Copies of this Order may be served by any means, including U.S. Mail, facsimile transmission, e-mail, United Parcel Service, and Federal Express, upon the Defendants and any other entity or person that may be subject to any provision of this Order.

61.　　There being no just cause for delay, the Clerk of the Court is hereby directed to enter this *Order for Entry of Default Judgment, Permanent Injunction,*

*Civil Monetary Penalties, and Ancillary Equitable Relief Against My Forex Planet,*

*Inc., Wal Capital, S.A., Top Global Capital, Inc., and Melody Nganthuy Phan.*

SO ORDERED, this ____9th____ day of ____February____, 2015, at Santa

Ana, California.

_____
ANDREW J. GUILFORD
UNITED STATES DISTRICT JUDGE